IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JOHN RAUBACK,                    )
                                 )
        Plaintiff,               )
                                 )
v.                               )        CASE NO. CV418-167
                                 )
CITY OF SAVANNAH, SAVANNAH       )
AIRPORT COMMISSION, and GREG     )
KELLY, in his individual and     )
official capacities,             )
                                 )
        Defendants.              )
_____)

**O R D E R**

Before the Court is Defendant City of Savannah's (the "City")

Motion for Summary Judgment (Doc. 82) and Defendants Savannah

Airport Commission ("SAC") and Greg Kelly's (collectively, "SAC

Defendants") Motion for Summary Judgment (Doc. 86). For the

following reasons, the City's motion (Doc. 82) is **GRANTED** and SAC

Defendants' motion (Doc. 86) is **GRANTED.**[1]

_____

[1] Also before the Court is SAC Defendants' Motion for Leave to File
a Supplemental Memorandum (Doc. 149), which Plaintiff has opposed
(Doc. 152). In their motion, SAC Defendants request leave to file
a supplemental memorandum in support of their motion for summary
judgment and motion to strike in light of recent decisions by the
Courts of Appeals for the Eleventh and Seventh Circuits. (Doc. 149
at 1.) The Court previously ruled on Defendants' motion to strike.
(Doc. 154.) Accordingly, to the extent SAC Defendants seek to
supplement their motion to strike, their motion (Doc. 149) is
**DISMISSED AS MOOT**. However, to the extent SAC Defendants seek to
supplement their motion for summary judgment, their motion (Doc.
149) is **GRANTED** and, in ruling on the motion for summary judgment,
the Court has considered the recent cases cited by SAC Defendants.

## BACKGROUND[2]

This case arises from alleged retaliation against Plaintiff John Rauback by SAC; Greg Kelly, SAC's executive director; and the City of Savannah. (Doc. 1, Attach. 2 at 3.) Plaintiff alleges that SAC Defendants and the City retaliated against him, in part, by terminating Plaintiff's employment with the SAC because Plaintiff reported various violations of law and policy by SAC representatives. (Id.) Plaintiff worked for SAC from July 2008 until his official termination in 2017, first as the director of administration and finance, and then later as the assistant executive director. (Doc. 86, Attach. 24 at ¶¶ 1, 2, 161; Doc. 155, Attach. 2 at ¶¶ 1, 2, 161.) In the following sections, the Court will describe SAC's history and its relationship to the City; Plaintiff's various duties as an employee of SAC; Plaintiff's various allegations against former SAC Commissioner Sylvester Formey; Plaintiff's complaints to Kelly about a SAC employee's

---

[2] The relevant facts are taken principally from the City's Statement of Undisputed Material Facts (Doc. 82, Attach. 5), SAC Defendants' Statement of Undisputed Material Facts (Doc. 86, Attach. 24), and Plaintiff's responses thereto (Doc. 93, Attach. 2; Doc. 155, Attach. 2). Pursuant to Federal Rule of Civil Procedure 56(e) and Southern District of Georgia Local Rule 56.1, all material facts not controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate. Where the parties offer conflicting accounts of the events in question, this Court draws all inferences and presents all evidence in the light most favorable to Plaintiff. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (citing Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011)).

discriminatory conduct; and the circumstances surrounding SAC's investigation and termination of Plaintiff.

I. THE SAVANNAH AIRPORT COMMISSION

In the 1940s and 1950s, the City established SAC through a series of acts and a local constitutional amendment provided by the General Assembly of the State of Georgia. (Doc. 82, Attach. 5 at ¶ 1; Doc. 93, Attach. 2 at ¶ 1); see also Savannah, Ga., Mun. Code Div. I, Art. 8, §§ 8-401, 8-410; Savannah, Ga., Mun. Code Div. I, Art. 10, § 10-101. SAC was created to "administer the improvement, maintenance and operation of municipally-owned airports of Savannah."[3] Savannah, Ga., Mun. Code Div. I, Art. 8, § 8-410. To carry out its mission, SAC was granted various administrative powers as set forth in the Savannah municipal code:

> The Airport Commission is authorized to enter into contracts for the rental of buildings, land, office space, equipment and any other property now owned by the Mayor and Aldermen of the City of Savannah located at or on the airport property, to adopt rules and regulations for the operation of said Commission and said airports, to receive all revenues from the sale or lease of any properties used in connection with said airport, rentals, fees, grants and contributions and to make payment out of said funds for all necessary expenses, salaries, improvements, etc., to hire and discharge all employees necessary to fill the duties of said Commission and to fix the salaries and/or compensations, and to have exclusive control, custody and direction of all lands, properties and improvements fixed in them by the Acts of the General Assembly and to have general direction of the same.

---

[3] SAC currently manages the Savannah/Hilton-Head International Airport. (Doc. 93, Attach. 1 at ¶ 1.)

Id. §§ 8-409, 8-414.

SAC is comprised of five commissioners appointed by the Mayor and Aldermen of the City for a term of five years. Id. §§ 8-403, 8-404. Pursuant to its personnel decision-making authority, SAC hires an Executive Director, who acts as the final personnel decision-maker over all subordinate employees. (Doc. 93, Attach. 1 at ¶¶ 3-4; Doc. 155, Attach. 2 at ¶ 8.)

Despite its broad administrative powers, SAC is still subject to limited oversight by the City. Notably, SAC is described in the municipal code "strictly as an operating agency of the Mayor and Alderman of the City of Savannah", and the City retains all legislative authority to provide by ordinance for the operation and maintenance of the municipal airports. Savannah, Ga., Mun. Code Div. I, Art. 8, § 8-414. SAC is annually required to provide the City's Mayor and Alderman with a detailed statement of operations and a proposed budget for the following year. Id. § 8-413. SAC is also required to return to the City treasury all funds unused or unallocated in a given year. Id. Yet, SAC is defined in the municipal code as a "body corporate and politic" with "the right to sue and be sued in its own name." Savannah, Ga., Mun. Code Div. I, Art. 8, § 8-402.

## II. <u>PLAINTIFF'S DUTIES AS A SAC EMPLOYEE</u>

In July 2008, Plaintiff was hired to be SAC's director of administration and finance for the Savannah/Hilton-Head International Airport (the "Airport"). (Doc. 86, Attach. 24 at ¶¶ 1, 2, 161; Doc. 155, Attach. 2 at ¶¶ 1, 2.) As director of administration and finance, Plaintiff's duties included, inter alia, managing the Airport's accounting and finance department; managing all airport administrative functions, including the human resources, procurement, contracts, and legal departments; and negotiating SAC employee benefits programs. (Doc. 86, Attach. 3 at 2-3.) Plaintiff was hired by Greg Kelly, then the assistant executive director, Patrick Graham, then the executive director, and a panel of two SAC commissioners. (Doc. 82, Attach. 5 at ¶ 4; Doc. 93, Attach. 2 at ¶ 4.)

In early 2014, Kelly, now the executive director, promoted Plaintiff to the position of assistant executive director. (Doc. 86, Attach. 24 at ¶ 2; Doc 155, Attach. 2 at ¶ 2.) Plaintiff described his duties as the assistant executive director as follows:

- Managed the day-to-day activities of operations, administration, accounting, finance, risk management, legal, and human resources at the Savannah/Hilton Head International Airport, as the 2nd in command, reporting to the Executive Director and a 5 member Commission

- Liaison with TSA, FAA, US Military, and Local Law Enforcement on the safety, security and ARFF of the airport . . .
- Update airport's policies, rules, and regulations with Executive Director
- Prepare and present monthly agenda items for Commission . . .
- Review and negotiate all airport contracts
- Primary liaison with legal counsel on all legal matters

(Doc. 86, Attach. 24 at ¶ 5; Doc 155, Attach. 2 at ¶ 51; Doc. 86, Attach. 3 at 2.)

During the entirety of Plaintiff's employment, Kelly and Graham conducted his performance reviews. (Doc. 82, Attach. 5 at ¶ 5; Doc. 93, Attach. 2 at ¶ 5.) No City employee, official, or agent supervised or otherwise instructed Plaintiff in the performance of his duties with SAC. (Doc. 82, Attach. 5 at ¶¶ 7-8; Doc. 93, Attach. 2 at ¶¶ 7-8.) SAC issued Plaintiff's paychecks; the City, however, administered Plaintiff's pension plan. (Doc. 82., Attach. 5 at ¶ 6; Doc. 93, Attach. 2 at ¶¶ 4-6; Doc. 98 at 4-5.) On December 11, 2014, Kelly rated Plaintiff's performance as assistant executive director as "above average" or "exceptional" in all categories and recommended that Plaintiff receive a four percent pay increase for the following year. (Doc. 155, Attach. 26.)

III. <u>PLAINTIFF REPORTS ONGOING VIOLATIONS OF DBE PROGRAM</u>

The Disadvantaged Business Enterprise ("DBE") program, first enacted by congress in 1983, requires a percentage of the federal funding made available to Department of Transportation operating agencies to be expended with for-profit small businesses owned primarily by socially and economically disadvantaged individuals.[4] The purpose of the DBE program is, in part, "to ensure nondiscrimination in the award and administration of DOT-assisted contracts in the Department's highway, transit, and airport financial assistance programs . . . ."[5] 49 C.F.R. § 26.1; <u>see also</u> 49 C.F.R. § 23.1. SAC's receipt of federal funding was contingent on its compliance with the federal regulations governing the DBE program. (Doc. 155, Attach. 23 at 17); <u>see also</u> 49 C.F.R. § 26.21(a)(3); 49 C.F.R. § 23.21. The DOT regulations require participating agencies to appoint a "DBE liaison officer, who shall have direct, independent access to [the operating agency's] Chief Executive Officer concerning DBE program matters." 49 C.F.R. §

---

[4] <u>See</u> Dept. of Transp., History of the DBE Program, https://www.transportation.gov/osdbu/disadvantaged-business enterprise/history-dot-dbeprogram (last visited March 25, 2021).
[5] "To be an eligible DBE, a firm must be at least 51 percent owned by socially and economically disadvantaged individuals." 49 C.F.R. 26.69(b). The DOT presumes social and economic disadvantage in the cases of "women, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, or other minorities found to be disadvantaged by the SBA . . . ." 49 C.F.R. § 26.67.

26.25. The liaison officer is "responsible for implementing all aspects of [the operating agency's] DBE program." Id.

As part of his job duties, Plaintiff served as SAC's liaison officer to the DBE program. (Doc. 86, Attach. 24 at ¶ 9; Doc. 155, Attach. 2 at ¶ 9.) As the liaison officer, Plaintiff was responsible for ensuring businesses participating in SAC's DBE program were certified with the Georgia DOT.[6] (Doc. 86, Attach. 24 at ¶ 16; Doc. 155, Attach. 2 at ¶ 16.) Plaintiff also reviewed SAC's reports about DBE compliance before they were disseminated to the Federal Aviation Administration. (Doc. 86, Attach. 24 at ¶ 37; Doc. 155, Attach. 2 at ¶ 37.)

Plaintiff stated in his deposition that, typically, Airport vendors would select their DBE partners, then submit them to the Airport for approval. (Doc. 86, Attach. 24 at ¶ 11; Doc. 155, Attach. 2 at ¶ 11; Doc. 155, Attach. 104 at 36.) On April 1, 2013, Plaintiff sent a notice of default to Paradies Shops, Inc. ("Paradies"), a company that ran a gift shop in the Airport. (Doc. 86, Attach. 5 at 2.) The notice informed Paradies that JenMack

---

[6] In his responses and objections to SAC Defendants' statement of material facts, Plaintiff contends that ascertaining DBE certifications was only his job "at some point" during his employment with SAC. (Doc. 155, Attach. 2 at ¶ 16.) To support his objection, Plaintiff states that he stopped working on DBE matters on September 7, 2015. Id. The Court views Plaintiff's statement as an admission that, prior to resigning as liaison officer, Plaintiff's job duties included reviewing DBE certifications.

South, LLC[7] ("JenMack"), Paradies' DBE partner, was not certified as a DBE with the Georgia Department of Transportation. (Id.) Plaintiff's notice instructed Paradies that it was in default of its lease agreement with the Airport due to its non-compliance with DBE certification requirements. (Id.)

On the same day, Kelly sent an email to Sylvester Formey, then the SAC chairman, informing Commissioner Formey of Plaintiff's actions. (Doc. 155, Attach. 35.) The email reads:

> Mr. Formey: last week while[] conducting his annual update, [Plaintiff] found that Paradies DBE is no longer on the DOT certification list. He contacted Paradies and they said they were unaware but they would look into it. He responded and confirmed. We sent the standard default letter to Paradies which they will get today. We hope this is just a paperwork issue between Mack and the State. We will offer assistance any way we can and we will keep you posted as we learn more.
>
> Greg.

(Id.) In his reply to the email, Commissioner Formey indicated that he was aware of the situation and that he would call Kelly to discuss the situation. (Id.)

On June 4, 2013, Plaintiff sent a letter to Paradies releasing them from default and requesting "that Paradies reinstate the dividend payments to the existing DBE partnership, [JenMack,] as well as reimburse them for the months withheld . . . ." (Doc. 86,

---

[7] In correspondence provided to the Court, JenMack is also sometimes referred to as "Mack II" or simply "Mack". (See, e.g., Doc. 86, Attach. 5 at 2; Doc. 155, Attach. 35.)

Attach. 6 at 2.) On June 19, 2013, Commissioner Formey sent an email to both Plaintiff and Kelly requesting an update on the DBE participation issues with Paradies and HMSHost, another Airport vendor. (Doc. 155, Attach. 36.) Formey also asked why Jennifer Thompkins, part owner of JenMack, had not received "back installments of the Management fees due." (Id.) Plaintiff responded, informing Formey that he had released Paradies from default, and that he spoke with representatives of both Paradies and the Georgia Department of Transportation, with the hopes of getting Thompkins DBE certified.[8] (Id.)

In his deposition, Plaintiff stated that, while attending a DBE conference during this time period, Bruce Feuer, a lawyer for Paradies, told Plaintiff that Formey was engaged in an inappropriate relationship with Thompkins.[9] (Doc. 155, Attach. 104

---

[8] On August 12, 2013, Plaintiff sent Formey another email explaining that Plaintiff had spoken with Paradies about a potential buyout for Mack Wilbourn, Thompkins' partner in JenMack. (Doc. 155, Attach. 37 at 1.) Plaintiff described the buyout as "step one in getting a local DBE (Jennifer Thompkins) certified as the joint venture partner with The Paradies Shops in Savannah, GA." (Id.)

[9] SAC Defendants contend that Feuer's statement to Plaintiff is inadmissible hearsay which cannot be considered at summary judgment. (Doc. 121 at ¶ 23.) "Hearsay statements, even if stated in a deposition, cannot be considered on a motion for summary judgment." Verna v. Pub. Health Tr. of Miami-Dade Cnty., 539 F. Supp. 2d 1340, 1350 (S.D. Fla. 2008) (citing Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999)). "However, if the statements are not being offered for the truth of the matter asserted, then the statements are not hearsay." Verna, 539 F. Supp. 2d at 1350 (citation omitted). Accordingly, the Court will consider the

at 73.) Plaintiff alleges that Feuer "was upset about the whole arrangement of the DBE program with Savannah and the inappropriate relations." (Id. at 72-73.) At some point, Plaintiff "hinted" to Kelly that there "might be something going on" between Formey and Thompkins, but Kelly never investigated the matter. (Doc. 155, Attach. 23 at 55.) On August 4, 2015, Paradies informed Plaintiff that they planned to buyout JenMack's interest in their Joint Venture and replace JenMack with another DBE partner, because, "[d]espite repeated assurances," JenMack was still not DBE certified. (Doc. 86, Attach. 7 at 2.)

In 2015, Plaintiff encountered problems with another one of SAC's DBE participants, HMSHost, a food and beverage concessions vendor at the Airport. (Doc. 155, Attach. 86 at ¶¶ 31-32.) At some point during HSMHost's relationship with the Airport, HMSHost's DBE partner died. (Doc. 155, Attach. 104 at 37.) Deb Vogel, a potential replacement DBE partner for HMSHost, called Plaintiff to voice her concerns about a partnership arrangement that Formey had proposed to her. (Doc. 86, Attach. 24 at ¶ 33; Doc. 155, Attach. 2 at ¶ 33.) According to Vogel, Formey said he would approve Vogel as the new DBE designee for HMSHost if Vogel partnered with a friend of Formey's daughter "who had zero experience in

---

statements only as evidence that Plaintiff believed Thompkins's relationship with the airport involved impropriety, but not as evidence that an inappropriate relationship actually existed.

restaurants," "didn't want to relocate to Savannah," and "had no money" to contribute to the venture. (Doc. 155, Attach. 104 at 37.) Plaintiff stated that this proposal appeared to him to be "some kind of kickback situation." (Id.) On July 17, 2015, Vogel emailed Formey declining his proposed arrangement because of Vogel's concerns that the proposed partner had "no experience in the food & beverage industry and no financial capital to invest." (Doc. 86, Attach. 8 at 2; Doc. 86, Attach. 24 at ¶ 34, Doc. 155, Attach. 2, at ¶ 34.) Vogel forwarded this email to Plaintiff's personal email address. (Doc. 86, Attach. 8 at 2; Doc 155, Attach. 104 at 37.)

On August 2, 2015, Plaintiff gave SAC Commissioners Sheldon Tenenbaum and Stephen Green a packet of documents that included information about the DBE compliance issues with Vogel and JenMack. (Doc. 86, Attach. 24 at ¶¶ 42-43; Doc. 155, Attach. 2 at ¶¶ 42-43.) Plaintiff did not inform Kelly before giving the packet to Tenenbaum and Green, but claims Kelly was aware of the issues contained in the packet. (Doc. 155, Attach. 104 at 32-33.) Plaintiff also discussed the issue with Commissioner Lois Wooten while visiting her in the hospital. (Doc. 86, Attach. 24 at ¶ 44; Doc. 155, Attach. 2 at ¶ 44.) Green stated in his deposition that he was aware of the ongoing DBE issues before receiving the packet, but that he and Tenenbaum were surprised that the issues had not

been resolved. (Doc. 155, Attach. 18 at 13.) At its monthly commission meeting in August 2015, SAC discussed the search for a new DBE partner for HMSHost. (Doc. 155, Attach. 21 at 3.) Tenenbaum expressed interest in providing input and suggestions to SAC staff to help find HMSHost a suitable partner. (Id.)

On September 7, 2015, Plaintiff sent an email to Kelly requesting to be removed as the DBE liaison officer for the Airport. (Doc. 86, Attach. 24 at ¶ 47; Doc. 155, Attach. 2 at ¶ 47.) Plaintiff blind copied Green and Tenenbaum to the email. (Doc. 155, Attach. 104 at 39; Doc. 155, Attach. 118 at 2.) In response, Kelly asked why Plaintiff didn't tell Kelly that Green and Tenenbaum were copied on the email, claiming that he was "blindsided." (Doc. 155, Attach. 118 at 2.) Plaintiff explained that he copied the commissioners so he wouldn't get "swift-boated" again. (Id. at 4.) Plaintiff states that he was "confused and concerned" about the whole DBE situation, because he had been told by Green to include Tenenbaum in all DBE meetings and calls, but then Formey had told him not to follow Green's direction.[10] (Id.)

_____

[10] In their response to Plaintiff's statement of additional material facts, SAC Defendants claim Plaintiff's email does not indicate that the commissioners were supposed to be included in DBE communications. (Doc. 121 at ¶ 38) SAC Defendants misquote Plaintiff's email as saying "[Green] said **not to** include [Tenenbaum] in all the meetings and calls . . . ." (Id.) In reality, Plaintiff wrote in the email that "[Green] said **to** include Sheldon in all the meetings and calls . . . ." (Doc. 155, Attach. 118 at 4.)

IV. <u>PLAINTIFF REPORTS CREDIT CARD MISUSE BY FORMEY</u>

As part of his job duties, Plaintiff oversaw SAC's finance department. (Doc. 155, Attach. 104 at 41.) In or around the summer of 2015, Plaintiff became aware of certain irregularities with Formey's corporate credit card statements. (<u>Id.</u> at 40-41.) Specifically, Plaintiff was concerned with the amount of non-reimbursable expenses being charged to Formey's card and the time that it took for Formey to reimburse the Airport for these expenses. (<u>Id.</u>) At the time, it was a commissioner's responsibility to repay all personal charges placed on corporate cards in a timely manner.[11] (Doc. 86, Attach. 10 at 2.)

Plaintiff alleges he and the SAC accounting department separately alerted Kelly to concerns with Formey's credit card statements. (Doc. 155, Attach. 104 at 41.) Kelly claims that Plaintiff informed him that Formey had been putting personal expenses on his airport credit card, but not that Formey's conduct

---

[11] Policy D, as outlined in SAC's Procedural Manual, states:

> Commissioners may request cash advances or use their Savannah Airport Commissioners Corporate American Express Card for business or travel expenses. The card has been issued for business related expenses only. Any charges placed on the card and deemed personal will be considered your responsibility to pay when the associated expense report for travel is turned in to Accounting.

(Doc. 86, Attach. 10 at 2.)

violated SAC's policies, and that Kelly was never shown Formey's credit card statements. (Doc. 155, Attach. 23 at 34, 36.) Kelly also alleges that Formey had already told Kelly he had made personal charges on his corporate card, but that he would reimburse the Airport for the expenses. (Doc. 155, Attach. 23 at 30.)

In July 2015, Plaintiff called Green and requested a meeting to discuss what he believed was credit card misuse by Formey. (Doc. 155, Attach. 104 at 28.) This exchange led to the meeting on August 2, 2015, when Plaintiff gave Green the packet containing Formey's corporate credit card statements, as well as information about potential DBE violations. (Doc. 86, Attach. 24 at ¶ 50; Doc. 155, Attach. 2 at ¶ 50; Doc. 155, Attach. 18 at 11-12.) Plaintiff gave Tenenbaum an identical packet. (Doc. 86, Attach. 24 at ¶ 50; Doc. 155, Attach. 2. at ¶ 50.) When Plaintiff discussed the potential DBE issues with Wooten, he also shared information with her about Formey's credit card misuse. (Doc. 86, Attach. 24 at ¶ 51; Doc. 155, Attach. 2 at ¶ 51.)

After receiving the packet, Green went to Kelly to inquire about Formey's credit card statements. (Doc. 155, Attach. 18 at 11-12.) After seeing the statements, Kelly told Green that he was unaware of the large number of personal charges Formey had been making on his corporate card. (Id. at 13.) Kelly's understanding was that the only issue with Formey's credit card statements was

that Tammi Clark, an airport employee who worked in the finance department, still needed some documentation to back up certain charges Formey had made. (Id.)

Because of an imminent mayoral election, Green suggested that Plaintiff wait before doing anything further with regards to the Formey credit card situation, "so that it didn't end up being pulled into the mayoral election and be on the front page and embarrass the airport." (Id. at 18.) Green then met with the Mayor to inform her of Formey's credit card misuse (Id. at 18; Doc. 155, Attach. 1 at ¶ 68; Doc. 121 at ¶ 68.) Green also met with City of Savannah Attorney Brooks Stillwell and provided Stillwell with documents regarding Formey. (Doc. 155, Attach. 1 at ¶ 69; Doc. 121 at ¶ 69.)

SAC subsequently engaged an independent accounting firm to conduct an audit of SAC's travel and business expense records for the period November 1, 2013 through December 31, 2015. (Doc. 155, Attach. 51 at 1; Doc. 155, Attach. 1 at ¶ 75; Doc. 121 at ¶ 75.) On January 25, 2016, the firm issued its final report, which found Formey had committed numerous violations of SAC's credit card policy. (Doc. 155, Attach. 51 at 1; Doc. 155, Attach. 1 at ¶ 76; Doc. 121 at ¶ 76.)

The report states:

There was an ongoing pattern of Chairman Formey using the card for personal charges while not on airport

16

> business. In addition, many of the credit card charges
> that were deemed personal were not reimbursed to the
> Savannah Airport Commission on a timely basis. These
> personal charges totaled $13,006.87.

(Doc. 155, Attach. 51 at 1.) Formey's conduct also violated Georgia law which governed the use of credit cards issued by the government.[12] (Doc. 155, Attach. 18 at 20; Doc. 86, Attach. 24 at ¶ 63; Doc. 155, Attach. 2 at ¶ 63.) Under pressure from the other SAC commissioners, Formey resigned as the Chairman of SAC in February 2016. (Doc. 155, Attach. 1 at ¶¶ 45, 77; Doc. 121 at ¶¶ 45, 77.)

## V. KELLY'S ALLEGED RETALIATION TOWARDS PLAINTIFF FOR REPORTING COMMISSIONER FORMEY

During Plaintiff's annual review on or about February 8, 2016, Kelly prepared an initial list of "2016 Goals and Objectives" for Plaintiff. (Doc. 155, Attach. 1 at ¶ 46; Doc. 121 at ¶ 46.) Plaintiff objected to two of the listed goals, which are provided below:

> 9. Make sure I am made aware, very clearly, when issues
> arise that may be improper. Just mentioning something
> does not mean I have a full understanding of the matter
> at hand.

---

[12] Under O.C.G.A. § 16-9-37(b):
> Any person who has been issued or entrusted with a
> financial transaction card by a government for
> specifically limited and specifically authorized
> purposes, provided such limitations and authorizations
> are made in writing, and who uses the financial
> transaction card in a manner and for purposes not
> authorized shall be punished as provided in subsection
> (b) of Code Section 16-9-38.

\*\*\*

14. Work on interaction skills with employees in general. Show respect and appreciation to them in your meetings.

(Doc. 155, Attach. 113, at 1; Doc. 155, Attach. 1 at ¶ 46; Doc. 121 at ¶ 46.) Plaintiff objected to goal nine, arguing that Kelly was "rewriting history." (Doc. 155, Attach. 104 at 25; Doc. 155, Attach. 1 at ¶ 47; Doc. 121 at ¶ 47.) Plaintiff also objected to goal fourteen, because "[Plaintiff] thought it was further documentation of [Kelly] coming up with a justification" to fire Plaintiff. (Doc. 155, Attach. 104 at 25.) Plaintiff refused to sign Kelly's list as it was initially prepared. (Id. at 25-26.) Ultimately, Kelly amended the 2016 Goals and Objectives to omit the two contested goals, and Plaintiff signed the amended list. (Doc. 155, Attach. 113 at 2; Doc. 121 at ¶ 47.)

Plaintiff alleges that, during this annual review meeting, Kelly verbally "threatened to fire [Plaintiff] over the protected activity," specifically reporting Formey's conduct to the SAC commissioners. (Doc. 155, Attach. 104 at 25.) Kelly admits that he almost fired Plaintiff that day; however, Kelly claims that Plaintiff acted in a belligerent and hostile manner during the meeting, and that was the real reason Kelly almost fired Plaintiff. (Doc. 155, Attach. 23 at 57; Doc. 121 at ¶ 48.)

In October 2016, Kelly promoted Fred McCosby to director of operations. (Doc. 155, Attach. 1 at ¶ 53; Doc. 121 at ¶ 53.) Prior

to McCosby's promotion and since early 2014, Plaintiff managed SAC's operations department. (Doc. 155, Attach. 1 at ¶ 55; Doc. 121 at ¶ 55.) Plaintiff believed Kelly reassigned his operational duties because Kelly was displeased with Plaintiff reporting Formey's conduct to the SAC commissioners. (Doc. 155, Attach. 104 at 23; Doc. 155, Attach. 1 at ¶ 54; Doc. 121 at ¶ 54.) Kelly's purported reason for delegating Plaintiff's operational duties was that Kelly needed Plaintiff "more in a financial role," due to large financial projects SAC was facing in the immediate future. (Doc. 155, Attach. 104 at 24; Doc. 121 at ¶ 54.)

In addition to the annual review and McCosby's promotion, Plaintiff identified two more adverse actions that he believes resulted from his reporting of Formey's involvement in the DBE violations and credit card misuse. Around November 2016, Kelly created multiple charts depicting the organizational hierarchy at SAC. (Doc. 155, Attach. 23 at 60-61.) In one version of the chart, Plaintiff was shown to report to Meghan Dunn, Kelly's assistant, instead of directly to Kelly. (Id.) Plaintiff approached Kelly about the chart, which he viewed as an attempt to undermine his position at SAC. (Doc. 155, Attach. 2 at ¶ 76.) Plaintiff also alleges that, after he reported Formey's conduct, he received less opportunities to make presentations at SAC commission meetings (Doc. 155, Attach. 104 at 45.)

VI. <u>PLAINTIFF REPORTS HARASSMENT AND DISCRIMINATION BY FRED MCCOSBY</u>

Fred McCosby began working at SAC in 2003. (Doc. 86, Attach. 24 at ¶ 90; Doc. 155, Attach. 2 at ¶ 90.) As stated previously, McCosby was promoted to the position of director of operations in October 2016. (Doc. 155, Attach. 1 at ¶ 53; Doc. 121 at ¶ 53.) Prior to McCosby's promotion, Plaintiff was McCosby's direct supervisor. (Doc. 86, Attach. 24 at ¶ 91; Doc. 155, Attach. 2 at ¶ 91.) McCosby and Plaintiff developed an acrimonious working relationship.[13] (Doc. 155, Attach. 1 at ¶ 85; Doc. 121 at ¶ 85.)

Plaintiff first met Geoffrey McIsaac in 2015, when McIsaac took part in an active-shooter drill at the Airport. (Doc. 86, Attach. 24 at ¶ 87; Doc. 155, Attach. 2 at ¶ 87.) Plaintiff recommended that SAC offer a job to McIsaac as the airport security manager.[14] (Doc. 86, Attach. 24 at ¶ 88; Doc. 155, Attach. 104 at 47.) Although he was not McCosby's first choice for the position, McCosby ultimately hired McIsaac as a security manager in October

---

[13] At one point, McCosby emailed one of his subordinates, Kim Arnsdorff, disparaging Plaintiff and calling him a "buffoon" and "disruptive." (Doc. 155, Attach. 1 at ¶ 85; Doc. 121 at ¶ 85.)

[14] Plaintiff contends that proffered evidence does not support the statement that Plaintiff "recommended" McIsaac for the security manager position. (Doc. 155, Attach. 2 at ¶ 88.) However, in Plaintiff's deposition, he answers affirmatively when asked if he recommended McIsaac for the position. (Doc. 155, Attach. 104 at 47.) Even construing the evidence in the light most favorable to Plaintiff, the Court finds no basis for Plaintiff's contention that he did not recommend McIsaac for the position of security manager.

2015. (Doc. 86, Attach. 24 at ¶¶ 94; Doc. 155, Attach. 2 at ¶¶ 94, 95.) As security manager, McIsaac reported directly to McCosby. (Doc. 86, Attach. 24 at ¶ 95; Doc. 155, Attach. 2 at ¶ 95.)

McIsaac is a former United States Marine and has been diagnosed with Post-traumatic Stress Disorder ("PTSD"). (Doc. 155, Attach. 1. at ¶ 82; Doc. 121 at ¶ 82.) Early on in his employment with SAC, McIsaac began to complain about McCosby to Rebecca Schmidt, SAC's manager of human resources and administration. (Doc. 155, Attach. 122 at 19.) McIsaac alleges that McCosby would often verbally abuse him by denigrating his military service and making inappropriate comments alluding to his PTSD. (Doc. 155, Attach. 97 at 12, 37.) Referencing McIsaac's employment training, McCosby would tell McIsaac that he was "in [McCosby's] bootcamp now." (Doc. 155, Attach. 1 at ¶ 91, Doc. 121 at ¶ 91.) McIsaac claims that McCosby often described the military as "a bunch of idiots," and "that they don't know what they're doing." (Doc. 155, Attach. 97 at 21.) According to McIsaac, in late 2016, McCosby started calling McIsaac "mental" as a way of exploiting McIsaac's PTSD to belittle him.[15] (Id., at 12-13.) McIsaac protested McCosby's use of the word "mental"—explaining that the word

_____

[15] In his deposition, McCosby claims that he never called McIsaac "mental." (Doc. 155, Attach. 93 at 35.) McCosby admits that he told McIsaac his "mental decision process or his decision-making process was not good", and that he might have said that McIsaac made "mental decisions." (Id. at 32.)

bothered him due to his PTSD. (Id.) Despite McIsaac's protests, McCosby allegedly continued to harass McIsaac by asking him if his "receptors" were working. (Id., at 12.) McCosby denies ever using the word "receptors" to describe McIsaac. (Doc. 155, Attach. 93 at 34.)

McIsaac went to Schmidt multiple times beginning in 2016, complaining that he was being harassed by McCosby because of his PTSD and stating he wished to file a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 155, Attach. 97 at 18-19.) McIsaac also complained to Schmidt that McCosby would do various things to diminish McIsaac's role with SAC, including leaving him off email chains, removing his regulatory approval authority and taking away his ability to run projects or security monitors. (Id. at 12; Doc. 155, Attach. 122 at 22.) Schmidt did not take notes of any of her meetings with McIsaac because "[McIsaac] didn't say anything specific", and only made general complaints like "my boss is not being nice to me." (Doc. 155, Attach. 1 at ¶ 117; Doc. 155, Attach. 122 at 117.) Schmidt often directed McIsaac to take his complaints to Plaintiff, and Schmidt reported McIsaac's complaints about McCosby to Plaintiff over ten times. (Doc. 155, Attach. 122 at 18; Doc. 155, Attach. 1 at ¶ 119; Doc. 121 at ¶ 119.) On March 2, 2017, McIsaac sent Plaintiff an email documenting a recent incident involving McCosby; Plaintiff

then forwarded the email to Kelly. (Doc. 155, Attach. 1 at ¶ 120; Doc. 121 at ¶ 120.)

On March 20, 2017, the TSA contacted McIsaac and McCosby to request information about an airport gate that had closed unexpectedly. (Doc. 155, Attach. 1 at ¶ 121; Doc. 121 at ¶ 121.) Because McCosby did not immediately answer TSA's message, McIsaac responded to TSA, informing the agency that the gate's functions had been temporarily disrupted by a lightning strike. (Doc. 155, Attach. 1 at ¶ 122; Doc. 121 at ¶ 122.) Shortly afterwards, McCosby responded to TSA, and McCosby's response was consistent with that of McIsaac's. (Doc. 155, Attach. 1 at ¶ 122; Doc. 121 at ¶ 122.) However, McCosby became upset with McIsaac because he did not contact McCosby before responding to TSA.[16] (Doc. 155, Attach. 1 at ¶ 124; Doc. 121 at ¶ 124.) McCosby called McIsaac into his office to reprimand him. (Doc. 155, Attach. 1 at ¶¶ 124, 125; Doc. 121 at ¶¶ 124, 125.) During their meeting, which McIsaac recorded, McCosby used the word "mental" several times to describe McIsaac's decision making. (Doc. 155, Attach. 1 at ¶ 125; Doc. 121 at ¶ 125.)

The following morning, March 21, 2017, McIsaac reported the incident with McCosby to Schmidt. (Doc. 86, Attach. 24 at ¶ 117;

---

[16] According to McCosby, it is "a longstanding tradition with [SAC] that we speak in one voice when it comes to the TSA or FAA regulatory entity . . . ." (Doc. 155, Attach. 1 at ¶ 124; Doc. 121 at ¶ 124.)

Doc. 155, Attach. 2 at ¶ 117.) Schmidt relayed the information to Plaintiff and told Plaintiff that he needed to do something about the situation. (Doc. 86, Attach. 24 at ¶ 118; Doc. 155, Attach. 2 at ¶ 118.) On the same morning, Plaintiff met with McCosby and gave him a verbal warning to stop harassing McIsaac. (Doc. 86, Attach. 24 at ¶ 99; Doc. 155, Attach. 2 at ¶ 99.) In this meeting, Plaintiff informed McCosby that McIsaac had complained of harassment by McCosby. (Doc. 155, Attach. 1 at ¶ 132; Doc. 121 at ¶ 132; Doc. 155, Attach. 104 at 54.) According to Schmidt, who was present for part of the meeting, when Plaintiff admonished McCosby for his management style, McCosby responded by saying "I'm going to continue in this management style." (Doc. 155, Attach. 122 at 28.) Plaintiff also told McCosby that he would speak to Kelly about the incident. (Id. at 29.) Plaintiff did not speak to Kelly prior to disciplining McCosby.[17] (Doc. 86, Attach. 24 at ¶ 102; Doc. 155, Attach. 2 at ¶ 102.)

On March 22, 2017, McCosby delivered a grievance letter to Kelly. (Doc. 155, Attach. 70.) In the letter, McCosby alleges, inter alia, that Plaintiff had unfairly accused McCosby of being an abusive manager during the March 21 meeting and that Plaintiff was targeting McCosby for dismissal because of his age. (Id. at

---

[17] In his deposition, Plaintiff stated that he believed Kelly was "on Pacific time" and, therefore, could not contact Kelly before meeting with McCosby. (Doc. 155, Attach. 104 at 51.)

2.) On April 10, 2017, McCosby sent Kelly a second grievance letter, in which McCosby stated that, according to McIsaac, Plaintiff had directed McIsaac to report any conversations between McCosby and McIsaac directly to Plaintiff. (Doc. 86, Attach. 16 at 2.) McCosby also stated that Plaintiff was attempting to undermine his position as the operations director for the Airport and requested Kelly "take corrective action on this matter." (Id.)

On April 12, 2017, Kelly met with Plaintiff and McCosby to discuss McCosby's grievances toward Plaintiff. (Doc. 86, Attach. 24 at ¶ 122; Doc. 155, Attach. 2 at ¶ 122.) Prior to the meeting, Plaintiff was unaware that McCosby had filed grievances against him and Plaintiff believed the purpose of the meeting was to counsel McCosby about his interactions with McIsaac. (Doc. 155, Attach. 1 at ¶ 142; Doc. 121 at ¶ 142.) Instead, Kelly had McCosby read the two grievance letters aloud to Plaintiff. (Doc. 86, Attach. 24 at ¶ 123; Doc. 155, Attach. 2 at ¶ 123.) At some point, McIsaac was called into the meeting, and Kelly admonished McIsaac for bringing his complaints about McCosby to Plaintiff, and made a statement to the effect of: "You're a marine, right, a hard charger? How would you like it if your guy had gone around your back to your sergeant, suck it up, marine." (Doc. 86, Attach. 24 at ¶ 125; Doc. 155, Attach. 2 at ¶ 125; Doc. 155, Attach. 23 at 75.) McIsaac later met with Plaintiff about their meeting with

McCosby and Kelly and expressed disappointment because he thought he had been following proper procedure reporting his problems with McCosby to human resources. (Doc. 155, Attach. 97 at 34.)

Shortly thereafter, Plaintiff retained the services of an outside human resources consultant, Max Muller, for advice on how to respond to the April 12 meeting. (Doc. 155, Attach. 1 at ¶ 150; Doc. 121 at ¶ 150.) On April 17, 2017, Plaintiff sent a letter that Muller prepared to Kelly, in which he expressed concerns about Kelly's handling of the situation between McCosby and McIsaac. (Doc. 155, Attach. 1 at ¶ 151; Doc. 121 at ¶ 151; Doc. 155, Attach. 72.) In the letter, Plaintiff describes what he believes to be unlawful conduct by the Airport and Kelly as follows:

> Executive Director Kelly:
>
> I [Plaintiff] am gravely worried that the manner in which certain claims of discrimination and harassment are being handled could, within the next 180 days, lead to the filing of complaints of discrimination and harassment. Those claims could be filed by Mr. Geoffrey McIsaac, Security Manager for the Savannah Airport Commission. Mr. McIsaac could file his claims with the Federal Equal Employment Opportunity Commission ("EEOC") and the City of Savannah Georgia . . . .
>
> In addition, if Mr. McIsaac's complaints are proven to be true, they will almost certainly lead to litigation against Mr. McCosby, you, and the Commission by (i) the EEOC under Title VII of the 1964 Civil Rights ACT ("Title VII") and the Americans with Disabilities Act ("ADA"); (ii) the Department of Justice ("DOJ") pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") and/or the Vietnam Era Veterans' Readjustment Act, as amended ("VEVRAA").

. . .

> Mr. Mclsaac has followed the Savannah Airport Commission
> Grievance Procedure, Personnel Policy Section 1.03. He
> did not arbitrarily go around his chain-of-command. He
> followed the Grievance Procedure's allowances that he
> should go to the Human Resources Department and/or to
> the Assistant Executive Director if his claims were
> against his direct superiors. And yet, based on
> statements you [Kelly] made directly to him, he could
> assert that you have become complicit in the
> discriminatory and harassing actions he alleges Mr.
> McCosby has engaged in. Specifically, if he feels that
> you are using your managerial position to intimidate him
> into not asserting his right to be free from
> discrimination in the workplace based on his veteran's
> status and his disabilities brought on by the physical
> and psychological wounds he suffered and suffers from as
> the result of his military service.
>
> Due to the manner in which I have been treated for
> fulfilling my obligations to investigate Mr. Mclsaac's
> allegations against Mr. McCosby, and bringing those
> claims to your attention, all in keeping with (i) my
> duties and responsibilities as both overseeing the Human
> Resources Department and as Assistant Executive
> Director, (ii) the Savannah Airport Commission
> Discrimination and Harassment Policy 1.28; and, (iii)
> the Savannah Airport Commission Grievance Procedure,
> Personnel Policy Section 1.03; I believe my rights under
> (a) Title VII, (b) City of Savannah Code of Ordinances
> Part 2, Chapter 3, Article C, Section 2-3066; (c) the
> Savannah Airport Commission Discrimination and
> Harassment Policy 1.28; and, (d) the Savannah Airport
> Commission Grievance Procedure, Personnel Policy Section
> 1.03, have been violated.

(Doc. 155, Attach. 72 at 1-2.) In the letter, Plaintiff makes

several demands of Kelly and the Airport, including:

> Pursuant to the Georgia Open Records Act, Code Section
> 50-18-71, I hereby demand that I be provided with copies
> of all written documents, in whatever form, that Mr.
> McCosby provided to you making insinuations and/or
> allegations of misconduct against me of any nature and

27

type . . . . I assert my legal right to examine and copy those documents.

. . .

As you are aware and have approved, I will be out of the country during the time period April 18 through May 2, 2017. Therefore, I further demand that I be afforded the opportunity to address any and all of Mr. McCosby's insinuations and allegations upon my return to work on May 3, 2017.

. . .

I respectfully suggests the following four (4) actions be taken to allow me to defend myself, as well as to protect <u>everyone's interests</u> . . . :

1) Copies of Mr. McCosby's grievances/statements be provided to me immediately;

2) I be granted an extension of time to respond to the allegations in writing, pursuant to the SAC Grievance Policy. I will return to the office on May 3, 2017;

3) Mrs. Rebecca Schmidt, Manager of HR and Administration be directed . . . to formally notify the airport's D&O Insurance Policy provider of the claims set out above.

   I hereby formally request coverage under this policy for defending myself against Mr. McCosby's baseless allegations. In the course of my investigation into Mr. McCosby's possible illegal actions against Mr. McIsaac, and your inaction to properly address these actions, I am acting within the scope of my employment and am performing my job duties and responsibilities as the Assistant Executive Director of the SAC. Mr. McCosby's claims against me, and the manner in which these matters are being handled, appear to be either or both an attempt to deflect away from Mr. McCosby's alleged unlawful words and actions or are in retaliation for my lawful and proper participation in handling Mr. McIsaac's discrimination and harassment claims;

4) I request that a thorough investigation be conducted of these and related issues by Mrs. Rebecca Schmidt,

Manager of HR and Administration, along with an
independent investigator. . . .

In closing let me point something out. My impression is
that this matter could be put to rest if Mr. McCosby
apologizes to Mr. McIsaac for the way he has treated
him, stops discriminating and harassing Mr. McIsaac, and
restores Mr. McIsaac's authority to act as SAC's
Security Manager (instead of sending out emails
withdrawing Mr. McIsaac's authority to do his job and
openly demeaning him).

And, similarly, if I stop being attacked for performing
the duties and responsibilities of my job which are in
the best interest of the SAC.

(Id. at 2-4.) Plaintiff's letter angered Kelly, who viewed the

letter as "adversarial and hostile." (Doc. 86, Attach. 24 at ¶¶

138-139; Doc. 155, Attach. 2 at ¶¶ 138, 139; Doc. 155, Attach. 23

at 79.) In deposition, Kelly admitted that Plaintiff's letter was

not what he expected from his "number two guy" and that, after

receiving the letter, Kelly decided he could no longer work with

Plaintiff. (Doc. 155, Attach. 23 at 79.)

In response to Plaintiff's request for documents in his

letter, Kelly asked Schmidt via email whether McIsaac had filed

any Title VII complaints while working for SAC. (Doc. 155, Attach.

74 at 1.) On April 24, 2017, Schmidt responded that "[McIsaac]

said he very much has felt that he has been harassed and that it

has been a hostile work environment." (Id.) According to Schmidt,

McIsaac also said that his work environment had improved in the

past few weeks and that he really enjoyed his employment with SAC. (Id.)

Between April 28 and 29, 2017, McCosby and Kim Arnsdorff, a SAC employee in the operations department, exchanged emails regarding a potential investigation spurred by Plaintiff's letter. (Doc. 155, Attach. 96.) Arnsdorff wrote that her understanding after speaking to Kelly was that the investigation would be conducted and that it would be confined in scope to the issues between Plaintiff, McCosby and McIsaac. (Id.) However, McCosby wrote in response, "Greg said it would be [an] important part of the investigation to include others[] who have witnessed [Plaintiff's] behavior . . ." and that he was "looking forward to the investigation." (Id.)

On May 1, 2017, Kelly informed Plaintiff that a third-party investigation would be taking place. (Doc. 155, Attach. 8 at 2.) Kelly described the scope of the investigation as covering "statements/allegations that [McCosby] made about [Plaintiff]" as well as "all of the issues [Plaintiff] raised in his April 17 letter." (Id.) Kelly also placed Plaintiff on administrative leave, explaining that "given [Plaintiff's] position of influence in this organization and [his] position over HR that it would be best for [him] to remain clear of the workplace while the investigation takes place." (Id.) Plaintiff responded that he did

not wish to be placed on administrative leave and that he believed being placed on administrative leave would "appear to be an adverse action, and incorrectly suggest wrongdoing on [Plaintiff's] part." (Id. at 1.) On May 2, 2017, Kelly advised Plaintiff that his decision to place Plaintiff on administrative leave would remain in effect. (Id.)

### VII. SAC'S INVESTIGATION AND TERMINATION OF PLAINTIFF

On May 1, 2017, SAC, at the recommendation of City of Savannah Attorney Brooks Stillwell, contacted Catherine Bowman to perform an investigation into Plaintiff's conduct. (Doc. 155, Attach. 1 at ¶ 169; Doc. 121 at ¶ 169.) Stillwell emailed Bowman on May 1, 2017 and forwarded her "documents from other employees complaining about [Plaintiff]" that had been previously been provided to Plaintiff in response to his April 17 letter. (Doc. 155, Attach. 77 at 1.) Bowman was unable to conduct the investigation at the time due to a scheduling issue, but SAC did not retain any other investigator at that time. (Doc. 155, Attach. 1 at ¶¶ 171-172; Doc. 121 at ¶¶ 171-172.)

On May 15, 2017, Kelly met with Plaintiff and SAC counsel Jimmy Blackburn to negotiate Plaintiff's departure from SAC. (Doc. 155, Attach. 1 at ¶ 174; Doc. 121 at ¶ 174.) During that meeting, Kelly told Plaintiff words to the effect of, "your employment with the airport is a bad marriage; it has to end." (Doc. 155, Attach.

1 at ¶ 175; Doc. 121 at ¶ 175.) Plaintiff brought a memorandum to the meeting, in which he explains why he believed his conduct with regards to the McIsaac situation was not only appropriate, but obligatory. (Doc. 86, Attach. 24 at ¶ 147; Doc. 155., Attach. 2. at ¶ 147; Doc. 86, Attach. 19 at 2-6.) The memorandum, in part, states:

> In my role as the Department Head for Human Resources, I have the unpleasant task of investigating claims, approving and signing off on disciplinary actions taken by managers, and signing off on all employee termination paperwork submitted by managers.
>                      . . .
> I believed these hostile actions [by McCosby] to be violations of Mr. McIsaac's Title VII rights, and in my capacity overseeing HR, I was compelled to report these actions and request an independent investigation.

(Doc. 86, Attach. 19 at 6.) Plaintiff also refuted accusations made by McCosby that Plaintiff had in the past unfairly targeted SAC employees for termination. (Id. at 4-6.)

On May 25, 2017, Kelly delivered a severance proposal to Plaintiff's home. (Doc. 86, Attach. 24 at ¶ 150; Doc. 155, Attach. 2 at ¶ 150.) The proposal provided that Plaintiff would remain on paid administrative leave until August 31, 2017 and receive a severance package in return for Plaintiff releasing all claims against SAC. (Doc. 155, Attach. 79 at 1-2.) Plaintiff rejected the proposal and obtained counsel. (Doc. 86, Attach. 24 at ¶ 151; Doc. 155, Attach. 2 at ¶ 151.)

In June 2017, SAC retained the services of Bowman to conduct an independent investigation of the complaints lodged against both Plaintiff and McCosby. (Doc. 86, Attach 24. at ¶ 153; Doc. 155, Attach. 2 at ¶ 153.) Bowman submitted her report to Blackburn and Stillwell on September 1, 2017. (Doc. 86, Attach. 21.) The "Executive Summary" of the report provides:

> In my opinion, after an investigation into Directors [Plaintiff] and Fred McCosby, I recommend that [Plaintiff], if allowed to remain as an employee of the Savannah Airport Commission (SAC) at all, be removed from supervising or having any authority over any Airport employees, and certainly be removed from the Human Resources department. Further, I recommend that Fred McCosby receive training in how to treat his employees with respect and courtesy at all times. I did not find any actionable discrimination based upon any protected status, nor did I find any actionable evidence of retaliation for whistleblowing, nor participation/ opposition of an unlawful employment practice.

(Id. at 2.) Based on Bowman's interviews with past and current SAC employee's about Plaintiff's conduct, Bowman concluded:

> . . . I do not believe that [Plaintiff] has the interpersonal skills to be either an HR Director or the Assistant Executive Director. [Plaintiff] abused his position, is egocentric, and seems to me to be insecure. He is quick to anger and become[s] defensive. He did not ever take ownership of any poor decisions, and always blamed others.

(Id. at 42.)

Plaintiff received the Bowman report in October of 2017. (Doc. 86, Attach 24. at ¶ 157; Doc. 155, Attach. 2 at ¶ 157.) Around the same time, Plaintiff's leave status was changed to unpaid leave.

33

(Doc. 86, Attach 24. at ¶ 158; Doc. 155, Attach. 2 at ¶ 158.) On October 3, 2017, Kelly presented Plaintiff with a second severance proposal, which would have allowed Plaintiff to continue employment with SAC as an outside consultant. (Doc. 155, Attach. 1 at ¶¶ 205-206; Doc. 121 at ¶¶ 205-206.) Plaintiff did not agree to this proposal. (Doc. 86, Attach. 24 at ¶ 159; Doc. 155, Attach. 2 at ¶ 159.) Discussions to resolve the dispute reached an impasse, and the Airport officially terminated Plaintiff on January 31, 2018.[18] (Doc. 86, Attach. 24 at ¶¶ 160-161; Doc. 155, Attach. 2 at ¶¶ 160-161.)

VIII. <u>PLAINTIFF'S CURRENT LAWSUIT</u>

On May 1, 2018, Plaintiff filed this action in the Superior Court of Chatham County, Georgia. (Doc. 1, Attach. 2.) On July 13, 2018, SAC Defendants removed the case to this Court pursuant to 28 U.S.C. § 1331. (Doc. 1 at ¶ 4.) In his complaint, Plaintiff advances three counts against Defendants related to his employment and termination (Doc. 1, Attach. 2 at 14, 16, 19.) In Count One, Plaintiff alleges that Defendants retaliated against him for engaging in speech protected by the First Amendment. (<u>Id.</u> at ¶¶ 61-62.) In Count Two, Plaintiff alleges that Defendants retaliated

---

[18] The Court notes that Plaintiff contends he was constructively terminated when he was placed on administrative leave on May 2, 2017, but Plaintiff agrees that his official termination occurred on January 31, 2018. (Doc. 155, Attach. 2 at ¶¶ 160-161.)

against him because he engaged in activity protected by the Georgia Whistleblower act, O.C.G.A. § 45-1-4(a)(2)-(3). (<u>Id.</u> at ¶¶ 75-78.) Finally, in Count Three, Plaintiff alleges he faced retaliation from the Defendants because he engaged in activities protected by the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4311(b). (<u>Id.</u> at ¶¶ 85-92.) The City and SAC Defendants have both filed separate motions for summary judgment seeking dismissal of Plaintiff's claims against them. (Docs. 82, 86.) Plaintiff opposes both motions. (Docs. 93, 155.)

## STANDARD OF REVIEW

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u> The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (<u>quoting</u> Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See,

e.g., <u>Tidwell v. Carter Prods.</u>, 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." <u>Barfield v. Brierton</u>, 883 F.2d 923, 933-34 (11th Cir. 1989).

## ANALYSIS

### I. <u>THE CITY'S MOTION FOR SUMMARY JUDGMENT</u>

The City moves for summary judgment on all of Plaintiff's claims. In its motion, the City argues that Plaintiff's claims fail because the City was not Plaintiff's employer and did not have control over Plaintiff's employment. (Doc. 82 at 1-2.) Specifically, the City contends that Plaintiff was an employee of SAC at all times relevant to this case and that Plaintiff has not produced evidence of any wrongdoing on the part the City. (<u>Id.</u> at 2.) In response, Plaintiff contends the City is liable for SAC's actions because SAC's authority is derived from the City's municipal code and City attorney Brooks Stillwell co-led a retaliatory investigation into Plaintiff's work conduct. (Doc. 93 at 1-2.) For the following reasons, the Court finds that the City's motion (Doc. 82) is due to be **GRANTED**.

A. Plaintiff's First Amendment § 1983 Claim Against the City

The City first moves for summary judgment on Plaintiff's claims brought under 42 U.S.C. § 1983. The City contends summary judgment is appropriate because Plaintiff has not brought forth any evidence that any of the alleged retaliatory actions were made in accordance with official City policy, and because SAC had no control over Kelly, the final policy maker with respect to Plaintiff's employment. (Doc. 82 at 7-8.) In response, Plaintiff avers that SAC derives its authority from the City's municipal code, and, thus, the City functionally ratified all of Kelly's decisions related to Plaintiff's termination. (Doc. 93 at 8-9.) Plaintiff also argues that the City is liable for the actions of City Attorney Brooks Stillwell, due to Stillwell's involvement in SAC's investigation of Plaintiff. (Id. at 10-11.)

A local government cannot be liable under § 1983 on a respondeat superior theory. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978); see also Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997). Instead, a plaintiff must establish that the constitutional deprivation he suffered resulted from an official policy of the municipality, or an unofficial policy or custom shown through the repeated acts of a final policymaker. See Turquitt v. Jefferson Cty., 137 F.3d 1285, 1287 (11th Cir. 1998) ("A local government

may be held liable under § 1983 only for acts for which it is actually responsible, acts which the local government has officially sanctioned or ordered.") (citations omitted). Plaintiff has not identified an official policy of the City which violated his constitutional rights; "[t]hus, Plaintiff must show the City 'has a custom or practice of permitting a constitutional violation and that the City's custom or practice is the moving force behind the constitutional violation.' " Rice v. James, No. CV 117-039, 2018 WL 2164885, at *5 (S.D. Ga. May 10, 2018) (quoting Grech v. Clayton Cnty., 335 F.3d 1326, 1330 (11th Cir. 2003)).

"Municipal liability may arise with regards to an employment decision, such as termination, provided that the decisionmaker 'possesses final authority to establish **municipal policy** with respect to the action ordered.' " Quinn v. Monroe Cnty., 330 F.3d 1320, 1325 (11th Cir. 2003) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S. Ct. 1292, 1299, 89 L. Ed. 2d 452 (1986) (emphasis added). However, in keeping with the principal that a local government can only be liable under § 1983 for injuries which the government itself caused, a municipality "can never be liable under § 1983 for the acts of those whom the Government has no authority to control." Turquitt, 137 F.3d at 1292.

i. <u>Liability for Kelly's Termination of Plaintiff</u>

In this case, Plaintiff claims the City is liable pursuant to § 1983 for the actions of SAC Executive Director Greg Kelly. (Doc. 93 at 8-11.) However, Plaintiff has produced no evidence that the City had any authority to control Kelly, the policy maker with final authority over Plaintiff's employment. The Savannah municipal code gives SAC the authority to hire and discharge employees and pay their salaries. Savannah, Ga., Mun. Code Div. I, Art. 8, § 8-415. Pursuant to the municipal code, SAC hires an Executive Director, who acts as the final personnel decision-maker over all subordinate employees. (Doc. 93, Attach. 1 at ¶¶ 3-4; Doc. 155, Attach. 2 at ¶ 8; Doc. 155, Attach. 18 at 6.) Because Plaintiff has not demonstrated that the City had the authority to control Kelly's decisions regarding SAC employees, the City cannot be held liable under § 1983 for Kelly's allegedly retaliatory actions.[19] See <u>Rice</u>, No. CV 117-039, 2018 WL 2164885, at *5 ("Accordingly, the City had no control over Judge James and therefore cannot be held liable for his actions under § 1983.").

Plaintiff claims, however, that because the City delegated authority to SAC through its municipal code, the City functionally

---

[19] In Plaintiff's response to the City's motion for summary judgment, Plaintiff acknowledges that SAC had "unrestricted authority to act without any review or oversight by the City." (Doc. 93 at 9.)

ratified all decisions made by SAC's Executive Director. (Doc. 93 at 9.) This claim fails for two reasons. First, the Georgia Legislature, and not the City, endowed SAC with its administrative powers. Savannah, Ga., Mun. Code Div. I, Art. 10, § 10-101. Second, Plaintiff's contention ignores the Court's obligation to "respect state and local law's allocation of policymaking authority." Turquitt, 137 F.3d 1285, at 1292. Notably the Georgia Legislature created SAC as a "body corporate and politic" with "the right to sue and be sued in its own name." Savannah, Ga., Mun. Code Div. I, Art. 8, § 8-402.

Plaintiff relies strongly on § 8-414 of the municipal code, which defines SAC "strictly as an operating agency of the Mayor and Alderman of the City of Savannah." Yet, § 8-414 and its corresponding code sections highlight the allocation of authority between the City and SAC. While the City retains all legislative authority over the Airport, SAC exercises authority over the administrative and operational functions of the Airport, such as terminating an employee. Savannah, Ga., Mun. Code Div. I, Art. 8, §§ 8-409, 8-414. When governing law imposes "complementary but distinct duties" upon two government agencies, the Court cannot hold one agency liable for an area of conduct clearly assigned to the other. See Turquitt, 137 F.3d at 1289 (finding "that the governing statutes impose complementary but distinct duties upon

41

counties and sheriffs with respect to the county jails"). The Court will not usurp the intentions of state and local lawmakers by imposing liability on the City for an area expressly delegated by law to SAC.

ii. <u>Liability for Stillwell's Participation in SAC's Investigation of Plaintiff</u>

The City is also not liable under § 1983 for Stillwell's participation in SAC's investigation of Plaintiff. As stated previously, a municipality cannot be liable under § 1983 on a respondeat superior theory. <u>Monell</u>, 436 U.S. at 690, 98 S. Ct. at 2036. Instead, the City can be held liable only for the execution of its official policy or custom. <u>Quinn</u>, 330 F.3d at 1325. Because Plaintiff has identified no official City policy which violated his constitutional rights, the City can only be held liable for Stillwell's actions if Stillwell acted as a "final policymaker" with regards to Plaintiff's employment. <u>Id.</u>; <u>see also</u> <u>Lopez v. Gibson</u>, 770 F. App'x 982, 992 (11th Cir. 2019) ("If the defendant is not a final policymaker, the plaintiff's § 1983 claim fails against a defendant in his official capacity.") (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)). "It is the plaintiff's burden to show that the official is a final policymaker." <u>Lopez</u>, 770 F. App'x at 992.

Plaintiff does not argue in his brief that Stillwell acted as a final policymaker on behalf of the city. Rather, Plaintiff argues

that Stillwell actively participated in SAC's pretextual investigation of Plaintiff to help provide justification for Plaintiff's termination. (Doc. 93 at 10-11.) Even assuming that Plaintiff's allegations are true, they do not establish a basis of liability against the City. The record shows that Kelly, and not Stillwell, possessed final employment decision-making authority over Plaintiff. (Doc. 93, Attach. 1 at ¶¶ 3-4; Doc. 155, Attach. 2 at ¶ 8; Doc. 155, Attach. 18 at 6.) Evidence that Stillwell participated in the investigation, by itself, is insufficient to support a finding that he acted as a final policymaker on behalf of the City.[20] See Lopez, 770 F. App'x at 993 (finding sheriff did not act as final policymaker with respect to employee's demotion because the demotion was subject to review and final approval by a supervisory board). Accordingly, the City cannot be held liable for Stillwell's participation in SAC's investigation of Plaintiff. Because Plaintiff has not established a basis of liability against

---

[20] Plaintiff's reliance on City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) is misplaced. In Praprotnik, the Supreme Court recognized that a municipality can be chargeable under § 1983 if "authorized policymakers [of the municipality] approve a subordinate's illegal decision and the basis for it." Id. 485 U.S. at 127, 108 S. Ct. at 926. Plaintiff seems to argue that the Stillwell, and the City by proxy, approved Kelly's decision to terminate Plaintiff. (Doc. 93 at 11.) However, Praprotnik only applies when the decision of a subordinate is subject to review and approval by the authorized policymakers. Id. 485 U.S. at 127, 108 S. Ct. at 926. As discussed above, the final decision to terminate Plaintiff remained at all times with Kelly.

the City under § 1983, the City's motion is **GRANTED** to the extent it seeks dismissal of Plaintiff's § 1983 claims.[21]

B. Plaintiff's USERRA Claim against the City

The City also moves for summary judgment on Plaintiff's claim for retaliation brought pursuant to the USERRA. (Doc. 82 at 10.) USERRA protects employees from workplace discrimination on the basis of their prior or prospective service in the armed forces. 38 U.S.C. § 4311(a). USERRA also protects non-service member employees from retaliation for taking action to enforce the provisions of the act. 38 U.S.C. § 4311(b). § 4311(b) provides that:

> An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

---

[21] Plaintiff also appears to briefly argue that the City is liable under § 1983 because it administered Plaintiff's pension and, therefore, deprived him of pension benefits as the result of his unlawful termination. (Doc. 93 at 11.) However, Plaintiff has produced no evidence that the City, as the administer of the plan, had any discretion to modify Plaintiff's pension other than at SAC's direction. See McMillian v. Monroe Cnty, 520 U.S. 781, 791, 117 S. Ct. 1734, 1740, 138 L. Ed. 2d 1 (1997) ("The county's payment of the sheriff's salary does not translate into control over him, since the county neither has the authority to change his salary nor the discretion to refuse payment completely.").

Id. The term "employer" is defined under USERRA as "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities . . . ." 38 U.S.C. § 4303(4)(A).

The City contends that Plaintiff's USERRA claim fails because it was not Plaintiff's employer under the Act's definition. (Doc. 82 at 10.) In response, Plaintiff does not argue that the City meets the general definition of "Employer" under the statute, but Plaintiff argues that the City should be considered Plaintiff's employer solely with respect to the administration of his pension plan. (Doc. 93 at 13.) The Court finds that the City does not qualify as Plaintiff's employer under USERRA. The record is clear that SAC employees are paid wages by SAC, not the City. Savannah, Ga., Mun. Code Div. I, Art. 8, § 8-410. And, as discussed at length, there is no evidence that the City had control over Plaintiff's employment opportunities. (Doc. 93, Attach. 1 at ¶¶ 3-4; Doc. 155, Attach. 2 at ¶ 8; Doc. 155, Attach. 18 at 6.)

However, Plaintiff argues that even if the City was not his employer in the "general sense," 38 U.S.C. § 4303(4)(C) creates an exception for pension plan administrators. (Doc. 93 at 13.) § 4303(4)(C) states:

> Except as an actual employer of employees, an employee pension benefit plan described in section 3(2) of the Employee Retirement Income Security Act of 1974 (29

U.S.C. 1002(2)) shall be deemed to be an employer only
with respect to the obligation to provide benefits
described in section 4318.

Id. Plaintiff contends that § 4303(4)(C) mandates a finding that
the City was his employer for purposes of USERRA with respect to
the denial of his pension benefits. (Doc. 93 at 13.) Yet, as the
City highlights, § 4303(4)(C) provides an exception for "employee
pension benefit plan[s]," not for employee pension plan
administrators. 38 U.S.C. § 4303(4)(C). Accordingly, the City does
not qualify as an employer even with respect to Plaintiff's pension
benefits.

Additionally, § 4303(4)(C) only applies to those plans
governed by the Employee Retirement Income Security Act ("ERISA").
Id. ERISA explicitly excludes government plans like the City's
from its purview. 29 U.S.C. § 1003(b)(1) ("The provisions of this
subchapter shall not apply to any employee benefit plan if . . .
such plan is a governmental plan (as defined in § 1002(32) of this
title).); 29 U.S.C. § 1002(32) ("The term 'governmental plan' means
a plan established or maintained for its employees by the
Government of the United States, by the government of any State or
political subdivision thereof, **or by any agency or instrumentality**
of any of the foregoing.") (emphasis added).

Further, 38 U.S.C. § 4303(4)(C) allows a cause of action
against an employee benefit plan for violations of 38 U.S.C.

§ 4318. Plaintiff's complaint alleges only that the City violated his rights under 38 U.S.C. § 4311(b). (Doc. 1, Attach. 2 at 19, 20.) Accordingly, Plaintiff has not pled a cognizable cause of action against the City. See Steelman v. Okla. Police Pension and Ret. Sys., 128 P.3d 1090, 1095 (Okla. Civ. App. 2005) ("Thus, retirement systems are not subject to liability under § 4311(a)."); see also Kathryn Piscitelli & Edward Still, The USERRA Manual § 2:4 (2020) ("Thus, except as an actual employer of employees, an employee pension benefit plan is subject to liability under § 4318 but not other sections of the Act."). For all the above reasons, the City's request for summary judgment on Plaintiff's USERRA claim is **GRANTED**.

II. SAC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SAC Defendants move for summary judgment on all of Plaintiff's claims against them. (Doc. 86.) Plaintiff opposes all of SAC Defendants' arguments. (Doc. 155.) For the following reasons, the Court finds SAC Defendants' motion (Doc. 86.) is due to be **GRANTED**.

A. Plaintiff's First Amendment § 1983 Claims Against SAC Defendants

"To state a claim under . . . [§] 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law and (2) such deprivation occurred under color of state law." Richardson v.

47

Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (citing U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001); Arrington v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir. 1998)). In his complaint, Plaintiff alleges that SAC Defendants' retaliated against Plaintiff because he engaged in speech protected by the First Amendment. (Doc. 1, Attach. 2 at 14.)

A § 1983 claim of retaliation for protected speech under the First Amendment is analyzed under a four-stage test. Johnson v. Clifton, 74 F.3d 1087, 1092 (11th Cir. 1996); Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989). Under this test, an employee must first establish that he engaged in free speech on a matter of public concern. Martinez v. City of Opa-Locka, 971 F.2d 708, 712 (11th Cir.1992); Bryson, 888 F.2d at 1565. The employee must then satisfy the Pickering balancing test by demonstrating the employee's First Amendment interests outweighed those of the employers in preserving the efficiency of government services. See, Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 1734, 20 L. Ed. 2d 811 (1968). Then the employee must show the employee's conduct was a substantial motivating factor in the adverse employment action. Martinez, 971 F.2d at 712; Bryson, 888 F.2d at 1565. If a plaintiff establishes the first three elements of his claim, the burden shifts to the employer under the fourth stage to show the employer would have taken the same

employment action in the absence of the protected speech. <u>Mt. Healthy City School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977); <u>see also</u> <u>Bryson</u>, 888 F.2d at 1565.

SAC Defendants raise a number of defenses to Plaintiff's § 1983 claims including: (1) that Plaintiff failed to include his speech related to McIsaac in his original complaint; (2) that SAC cannot be held liable for Kelly's actions; (3) that Plaintiff did not engage in constitutionally protected speech; (4) that Plaintiff cannot prove that his protected speech was a substantial motivating factor for any adverse employment action; and (5) that Kelly is entitled to qualified immunity. (Doc. 87 at 22-29, 24 n.18; Doc. 116 at 6-8.)

i. <u>Plaintiff's Failure to Include Ground for First Amendment Claim in His Complaint</u>

SAC Defendants contend that the Court should not consider Plaintiff's speech with respect to McIsaac's treatment because Plaintiff did not include that speech in his complaint as a ground for his First Amendment claim. (Doc. 87 at 24 n.18; Doc. 116 at 6-8.) Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 10(b) further provides:

> A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a

> single set of circumstances. A later pleading may refer
> by number to a paragraph in an earlier pleading. If doing
> so would promote clarity, each claim founded on a
> separate transaction or occurrence—and each defense
> other than a denial—must be stated in a separate count
> or defense.

Fed. R. Civ. P. 10(b).

Under Plaintiff's § 1983 claim in the complaint, Plaintiff

alleges that:

> "Plaintiff engaged in speech protected by the First
>
> Amendment . . . on multiple occasions, **including but not**
>
> **limited to,** when he disclosed former SAC Chairman
>
> Sylvester Formey's unlawful credit card expenditures and
>
> violations of the laws, rules, and regulations
>
> applicable to the Federal Aviation Administration's
>
> Disadvantaged Business Enterprise Program."

(Doc. 1, Attach. 2 at ¶ 61.) (emphasis added) While Plaintiff did

not explicitly allege that his disapproval of McCosby's treatment

of McIsaac's was protected speech, Plaintiff included several

factual allegations in the complaint relating to this speech. (Id.

at ¶¶ 34-36.) Accordingly, Plaintiff's complaint is sufficiently

pled to satisfy the Rule 8(a)'s liberal notice pleading

requirement. See Swierkiewicz v. Sorema, 534 U.S. 506, 511, 122 S.

Ct. 992, 998 152 L. Ed. 2d 1 (2002) (Rule 8(a)'s "simplified notice

pleading standard relies on liberal discovery rules and summary

judgment motions to define disputed facts and issues and to dispose

of unmeritorious claims."); <u>see also</u>  <u>Weiland v. Palm Beach Cnty.</u>
<u>Sheriff's Office</u>, 792 F.3d 1313, 1324 (11th Cir. 2015) (finding
dismissal under Rules 8(a)(2) and 10(b) is only appropriate where
it is "virtually impossible" to know which allegation of fact are
intended to support which claims for relief). As a result, the
Court will consider whether Plaintiff's speech related to
McCosby's treatment of McIsaac is protected by the First Amendment
and, if so, whether Plaintiff suffered adverse employment actions
as a result of said speech.

### ii. SAC's Liability for Kelly's Actions

Before reaching the merits of Plaintiff's § 1983 claim, the
Court must first address SAC Defendants' brief argument that SAC
cannot be held liable under § 1983 for the Kelly's alleged
unconstitutional acts. (Doc. 87 at 29.) SAC is correct that
government entities may not be held liable for actions of their
subordinates under a respondeat superior theory. <u>Monell</u>, 436 U.S.
at 690, 98 S. Ct. at 2036, 56 L. Ed. 2d 611. However, as explained
supra, "[m]unicipal liability may arise with regards to an
employment decision, such as termination, provided that the
decisionmaker 'possesses final authority to establish **municipal**
**policy** with respect to the action ordered.' " <u>Quinn</u>, 330 F.3d at
1325 (quoting <u>Pembaur</u> 475 U.S. at 481, 106 S. Ct. at 1299, 89 L.
Ed. 2d 452).

In this case the record is clear that Kelly acted as the final policy maker with regards to Plaintiff's employment. It is undisputed that Kelly, as SAC's executive director, acts as the final personnel decision-maker over all subordinate employees. (Doc. 93, Attach. 1 at ¶¶ 3-4; Doc. 155, Attach. 2 at ¶ 8; Doc. 155, Attach. 18 at 6.) Commissioner Green testified that decision-making authority over subordinate staff is the exclusive realm of the executive director, and that "[h]iring and firing by the executive director is his decision alone." (Doc. 155, Attach. 18 at 6.) Accordingly, the Court finds that Kelly had final policymaking authority with respect to Plaintiff's employment and SAC is subject to liability for Kelly's actions to the extent they are illegal under § 1983. See Martinez, 971 F.2d at 713-15 (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review"); Mandel v. Doe, 888 F.2d 783, 792-94 (11th Cir. 1989) (recognizing that a municipal officer has final policymaking authority when his decisions "are not subject to review"); contra Smith v. Deal, CV 2:17-143, 2019 WL 956807, at *5 (S.D. Ga. Feb. 27, 2019) (finding defendant was not official policymaker regarding decision to terminate Plaintiff because the City Grievance Committee had plenary review over that decision).

### iii. <u>Plaintiff's Protected Speech</u>

The first prong a § 1983 First Amendment retaliation claim must satisfy is a showing that the plaintiff engaged in speech protected by the First Amendment. <u>Alves v. Bd. Of Regents of the Univ. Sys. of Ga.</u>, 804 F.3d 1149, at 1159-60 (11th Cir. 2015) A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment. <u>Bryson</u>, 888 F.2d at 1565. While a public employee "must accept certain limitations on his freedom[s]," <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006), he does not "relinquish the First Amendment rights he would otherwise enjoy as [a citizen] to comment on matters of public interest," <u>Pickering</u>, 391 U.S. at 568, 88 S. Ct. at 1734. Thus, the aim is to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Pickering</u>, 391 U.S. at 568, 88 S. Ct. at 1734-35.

In <u>Garcetti</u>, the Supreme Court laid out the two-step inquiry to determine whether speech of a public employee is constitutionally protected:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on . . . [his] employer's reaction to

> the speech. If the answer is yes, then the possibility
> of a First Amendment claim arises. The question becomes
> whether the relevant government entity had an adequate
> justification for treating the employee differently from
> any other member of the general public [based on the
> government's interests as an employer].

Garcetti, 547 U.S. at 418, 126 S. Ct. at 1958 (citations omitted).

"Both steps are questions of law for the court to resolve." Alves,

804 F.3d at 1159 (11th Cir. 2015) (citing Moss v. City of Pembroke

Pines, 782 F.3d 613, 618 (11th Cir. 2015); Battle v. Bd. of

Regents, 468 F.3d 755, 760 (11th Cir. 2006) (per curiam)).

The first step of the Garcetti inquiry is divided into two

subparts. For Plaintiff's speech to be constitutionally protected,

he must have spoken (1) as a citizen and (2) on a matter of public

concern. Alves, 804 F.3d at 1160. "Garcetti's 'threshold layer'

looks at both the 'role the speaker occupied' and 'the content of

the speech' to determine whether the government retaliation at

issue warrants the Pickering analysis". Id. (citing Davis v.

McKinney, 518 F.3d 304, 312 (5th Cir. 2008)). "If the employee

spoke as a citizen and on a matter of public concern, the

possibility of a First Amendment claim arises, and the inquiry

becomes one of balance; on the other hand, if the employee spoke

as an employee and on matters of personal interest, the First

Amendment is not implicated, and the constitutional inquiry ends

with no consideration of the Pickering test . . . . Id., 804 F.3d

54

at 1160 (citing Boyce v. Andrew, 510 F.3d 1333, 1343 (11th Cir. 2007)) (internal quotations and citations omitted).

The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421, 126 S. Ct. at 1960, 164 L. Ed. 2d 689. Under Garcetti, the central question is "whether the speech at issue 'owes its existence' to the employee's professional responsibilities." Moss, 782 F.3d at 618 (quoting Garcetti, 547 U.S. at 421, 126 S. Ct. at 1960, 164 L. Ed. 2d 689. However, "the exception to First Amendment in Garcetti for speech that owes its existence to a public employee's professional responsibility must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of [his] employment, not merely speech that concerns the ordinary responsibilities of [his] employment." Alves, 804 F.3d at 1162 (internal quotations and citations omitted). "Practical factors that may be relevant to, but are not dispositive of, the inquiry include the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." Id. at 1161 (citing Moss, 782 F.3d at 618).

Plaintiff has identified three instances in which he engaged in speech protected by the First Amendment: (1) reporting former SAC Commissioner Formey's credit card misuse to Commissioners Green and Tenenbaum; (2) reporting SAC's potential violations of the DBE; and (3) advocating on behalf of McIsaac in his April 17, 2017 letter to Kelly. (Doc. 155 at 21-23.) SAC Defendants contend Plaintiff's First Amendment claim fails because Plaintiff spoke pursuant to his duties as a SAC employee and not as a citizen. (Doc. 87 at 23-24.) After reviewing the record in this case, the Court finds that, in all three instances, Plaintiff spoke pursuant to his official duties as a SAC employee, and therefore, his speech does not implicate First Amendment protection.

Plaintiff argues, however, that he stepped outside of his ordinary job duties when he reported Formey's credit card use to SAC commissioners because Plaintiff's job description did not include an obligation to enforce SAC's policies on Commissioners. (Doc. 155 at 21.) The Court disagrees. Plaintiff reported Formey's credit card misuse in July 2015. (Doc. 155, Attach. 104 at 41.) At that time, part of Plaintiff's role as assistant executive director included oversight over SAC's finance and accounting department. (Id. at 13, 41; Doc. 86, Attach. 3 at 1.) It was in this capacity that Plaintiff initially informed Kelly of Formey's irregular credit card activity during monthly meetings with Kelly and members

of the accounting department. (Doc. 155, Attach. 104 at 41.) Plaintiff explained to Kelly that he was concerned Formey's credit card activity could impact SAC's end of the year audit. (Id. at 34.) Plaintiff then reported Formey's conduct to Commissioners Green and Tenenbaum after Kelly allegedly advised Plaintiff to "[l]ook the other way, let [Formey] have it." (Id. at 33.)

It is incontrovertible that Formey's activity impeded the accounting department's ability to record commissioner expense reports in compliance with SAC policy. (Doc. 155, Attach. 20 at 4.) While reporting misconduct by commissioners may not have been a daily activity for Plaintiff, it is clear that Plaintiff did so in furtherance of his duties as SAC's head of finance and accounting. The Eleventh Circuit has held that when an employee speaks out against misconduct by a superior that interferes with his job functions, that "speech 'owes its existence' to their professional responsibilities, and it 'cannot reasonably be divorced from those responsibilities.' " Alves, 804 F.3d at 1165 (quoting Garcetti, 547 U.S. at 421, 126 S. Ct. at 1960, 164 L. Ed. 2d 689; Abdur-Rahman v. Walker, 567 F.3d 1278, 1283 (11th Cir. 2009)). Accordingly, the Court finds Plaintiff's disclosure of Formey's credit card activity was made pursuant to his job duties and does not implicate the First Amendment. See Alves, 804 F.3d at 1163-65 (finding clinical psychologists spoke pursuant to their

job duties when they complained to officials "well outside their chain of command" that a superior's conduct interfered with their ability to perform their jobs); see also King v. Bd. of Cnty. Comm'rs, 916 F.3d 1339, 1347 (11th Cir. 2019) (finding First Amendment did not provide protection to county employee who "spoke about precisely the types of things that one would expect given her role with the county."); Boglin v. Bd. of Trs. Of Ala. Agric. & Mech. Univ., 290 F. Supp. 3d 1257, 1269 (N.D. Ala. 2018) ("[A]s the Eleventh Circuit has repeatedly found, an employee who makes internal reports regarding mismanagement and fraud generally speaks pursuant to [his] professional duties rather than as a citizen.") (collecting cases).

For the same reason, the Court finds Plaintiff's reports of SAC's noncompliance with the DBE were made pursuant to his duties as SAC's DBE liaison officer. As the liaison officer, Plaintiff was responsible for ensuring businesses participating in SAC's DBE program were, in fact, certified. (Doc. 86, Attach. 24 at ¶ 16; Doc. 155, Attach. 2 at ¶ 16.) Plaintiff also reviewed SAC's reports about DBE compliance before they were disseminated to the Federal Aviation Administration. (Doc. 86, Attach. 24 at ¶ 37; Doc. 155, Attach. 2 at ¶ 37.) As Plaintiff highlights in his response brief, the pressure he felt from Formey to contract with JenMack, who was not DBE compliant, undermined Plaintiff's ability to function as

the liaison officer for SAC. (Doc. 155 at 22.) Accordingly, Plaintiff's speech about SAC's potential DBE violations was made in furtherance of his employment and is not protected by the First Amendment.[22] See Alves, 804 F.3d at 1165. ("[I]mplicit in [the] duty to perform [one's job] . . . is the duty to inform . . . those that would appear to have the most need to know and best opportunity to investigate and correct . . . the barriers to" the performance of that job.); see also, Keller v. City of Tallahassee, 181 F. Supp. 3d 934, 954 (N.D. Fla. 2015) ("Here, [plaintiff's] speech concerned people whose alleged misdeeds had, in [plaintiff's] estimation, interfered with his progress in the training program, so his reporting of those misdeeds was implicit in his duty to perform his job.").

Lastly, Plaintiff's April 17, 2017, letter raising concerns about McCosby's discriminatory treatment of McIsaac was directly related to Plaintiff's job duties. The human resources department

---

[22] Plaintiff, perhaps acknowledging that reporting the DBE violations was within his ordinary duties, claims his protected speech was not actually reporting the violations, but the email he sent to the SAC Commissioners and Kelly stating that he was resigning as DBE liaison. (Doc. 155 at 22.) However, Plaintiff admits that the purpose of his resignation was to "oppose[] the continued noncompliance of SAC with federal regulations containing DBE certification requirements." (Id.) Regardless of whether the resignation can be considered speech for the purposes of a § 1983 claim, the Court finds Plaintiff's email was made pursuant to his employment responsibilities as DBE liaison, even if he was resigning from that role.

reported to Plaintiff. (Doc. 155, Attach. 104 at 27.) It was Schmidt, SAC's human resources manager, who first reported McCosby's mistreatment of McCIsaac to Plaintiff and requested that Plaintiff take action. (Doc. 86, Attach. 24 at ¶ 118; Doc. 155, Attach. 2 at ¶ 118.) Notably, in his letter, Plaintiff states that investigating McIsaac's allegations against McCosby and bringing those claims to Kelly's attention was "all in keeping with [] [his] duties and responsibilities as both overseeing the Human Resources Department and as Assistant Executive Director . . . ." (Doc. 155, Attach. 72 at 2.) As a result, the Court finds Plaintiff's April 2017 letter was speech made pursuant to his duties as a SAC employee. See Alves, 804 F.3d at 1165. Plaintiff has not presented evidence that he engaged in protected speech under Garcetti and its progeny. As a result, SAC Defendants' motion (Doc. 82) is **GRANTED** to the extent it seeks dismissal of Plaintiff's § 1983 claims.

B. Plaintiff's USERRA Claim Against the SAC Defendants

As previously stated, USERRA protects employees from workplace discrimination on the basis of their prior or prospective service in the armed forces. 38 U.S.C. § 4311(a). USERRA provides protection for employees, including non-service members, from retaliation for taking action to enforce the provisions of the act. Id. § 4311(b). "An employer engages in prohibited retaliatory

conduct where it takes an adverse action against an employee motivated by that employee's efforts to enforce the USERRA, unless the employer can prove that the action would have been taken in the absence of the employee's protected activity." Ward v. United Parcel Service, 580 F. App'x 735, 739 (11th Cir. 2014) (citing 38 U.S.C. § 4311(c)(2)).

The Eleventh Circuit has applied Title VII retaliation principles in cases brought under USERRA. See Id.; Lambert v. United Parcel Service, Inc., 266 F. Supp. 3d 1369, 1371-72 (M.D. Fla. 2017). "To establish a prima facie case of retaliation, an employee must generally demonstrate the following: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Lambert, 266 F. Supp. 3d at 1371-72 (citing Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007)).

Plaintiff alleges SAC Defendants violated USERRA by retaliating against him for opposing McIsaac's military-status based discrimination. (Doc. 1, Attach. 2 at ¶ 86-89.) In their motion for summary judgment, SAC Defendants argue that Plaintiff did not engage in a protected activity under USERRA because he did

not speak outside his role as assistant executive director.[23] (Doc. 87 at 31.) Alternatively, Sac Defendants argue they would have terminated Plaintiff regardless of his speech in opposition to McIsaac's treatment. (Doc. 87 at 31-32.)

   i. Protected Activity

The Eleventh Circuit has not addressed the issue of what constitutes a protected activity in a USERRA claim brought by a non-military employee. Courts that have dealt with this situation have required that the non-military employee "step outside of his or her role of representing the company . . . ." Williams v. City of Allentown, No. 5:17-cv-04910, 2018 WL 3707382, at *10 (E.D. Pa. Aug. 3, 3018) (quoting Atkinson v. Lafayette Coll., 653 F. Supp. 2d 581, 598-99 (E.D. Pa. 2009)); see also Cook v. CTC Comm'ns Corp., No. 06-cv-58-JD, 2007 WL 3284337, at *9 (D. N.H. Oct. 30, 2007). In doing so, courts are importing principles present in other employment retaliation claims.

In a Title VII retaliation context, the Eleventh Circuit adopted the "manager rule" which holds that a "management employee that, in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in 'protected activity' " Brush v. Sears Holding Corp., 466 F. App'x 781, 787

---

[23] SAC Defendants concede for the purposes of summary judgment that Plaintiff suffered an adverse employment action when Kelly placed him on administrative leave in May of 2017. (Doc. 87 at 26.)

(11th Cir. 2012). In Brush, the plaintiff, a loss prevention officer for Sears was tasked with investigating claims of sexual harassment brought by a Mrs. Doe. Id. at 784. After Mrs. Doe informed the plaintiff that a Sears employee had raped and harassed her, the plaintiff urged Sears management to notify police. Id. When Sears declined to report the matter, the plaintiff strongly opposed Sears handling of the investigation. Id. Sears terminated plaintiff shortly thereafter for failing to comply with Sears policy for investigating sexual harassment claims. Id.

The Eleventh Circuit found that the plaintiff acted within her capacity as a loss prevention officer when she investigated Mrs. Doe's allegations and reported those findings to Sears. Id. at 787. Further, the court found the plaintiff's opposition to Sears's handling of the investigation amounted to "[d]isagreement with internal procedures [that] does not equate with 'protected activity' opposing discriminatory practices." Id. The Court found no evidence that plaintiff was asserting any rights of her own in relation to the harassment claim or that she took any action adverse to the company during the investigation. Id.

Plaintiff urges this court not to follow Brush, pointing out that it is an unpublished opinion and, therefore, merely persuasive authority. (Doc. 155 at 32 n.8.) Although Brush is persuasive and not binding authority from the Eleventh Circuit, the "manager rule"

has been consistently applied in Title VII cases decided by district courts within the Eleventh Circuit. See, e.g., McMullen v. Tuskegee Univ., 184 F. Supp. 3d 1316, 1323 (M.D. Ala. 2016); Cyrus v. Hyundai Motor Mfg. Ala., LLC, No. 2:07cv144, 2008 WL 1848796 at *12 (M.D. Ala. Apr. 24, 2008); Fletcher v. Supreme Beverage Co., No. 2:11-CV-00056-MHH, 2014 WL 5518294, at *17 (N.D. Ala. Oct. 31, 2014), appeal dismissed (May 11, 2015); Raney v. Paper & Chemical Supply, Co., No. 5:10cv445, 2012 WL 1745611 at *6-7 (N.D. Ala. Apr. 24, 2012). Considering the Eleventh Circuit's application of Title VII analysis in USERRA cases, See Lambert, 266 F.Supp.3d at 1371-72, the Court is persuaded that the "manager rule" equally applies in a case brought under USERRA.

As discussed previously, the record is clear that Plaintiff acted in his role as a manager when investigating and reporting on McIsaac's mistreatment. Plaintiff had oversight over the Human resources department. It was in that capacity that he learned of McIsaac's claims, investigated the claims, and ultimately reported them to Kelly. (Doc. 155, Attach. 104 at 27; Doc. 155, Attach. 2 at ¶ 118; Doc. 155, Attach. 72 at 2; Doc. 86, Attach. 24 at ¶ 118) Like in Brush, Plaintiff's opposition to Kelly's handling of McIsaac's grievances does not constitute a "protected activity." See Brush, 466 F. App'x 781, 787.

Plaintiff contends that, even if the "manager rule" applies, Brush is distinguishable because, unlike the plaintiff in Brush, Plaintiff was not a disinterested party when he sent the letter to Kelly. (Doc. 155 at 32-33.) However, Plaintiff's letter raised concerns that Plaintiff was being mistreated for his handling of the investigation, not because he had suffered any military-status based discrimination himself. (Doc. 155, Attach. 72 at 1-4.) As a result, the Court finds Plaintiff was not an aggrieved or interested party with respect to the alleged military-status discrimination on which his USERRA claim is founded. Fletcher, 2014 WL 5518294, at *17 ("Therefore, [plaintiff] did not engage in protected activity because he did not lodge a personal complaint about racial discrimination at SBC."). The Court also does not find that Plaintiff took a position adverse to his employer outside of the role of his employment. Plaintiff sent the letter to Kelly alone, as opposed to initiating a public action, and the suggestions made in the letter were in Plaintiff's own words "to allow [him] to defend [himself], as well as to protect **everyone's** interests." (Doc. 155, Attach. 72 at 2-3); see Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617, 628 (5th Cir. 2008) (holding that voicing employee concerns is not adverse to a company's interests but is exactly what is expected of a manager; otherwise nearly every activity in the normal course of a manager's job would

potentially be protected activity). Accordingly, because Plaintiff did not engage in protected activity, the Court **GRANTS** SAC Defendants' motion (Doc. 86) to the extent it seeks dismissal of Plaintiff's USERRA claims.

### III. GEORGIA WHISTLE BLOWER ACT CLAIMS

Lastly, the City and SAC Defendants argue that they are entitled to summary judgment on Plaintiff's claim that the City violated the Georgia Whistleblower Act, O.C.G.A. § 45-1-4. (Doc. 37 at 33.) Because the Court has granted summary judgment on Plaintiff's First Amendment and USERRA retaliation claims, no federal cause of action remains in this case. As such, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims under the Georgia Whistleblower Act. See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004); see also Gray v. Royal, 181 F. Supp. 3d 1238, 1254 (S.D. Ga. 2016) ("Courts are encouraged to avoid exercising supplemental jurisdiction when original jurisdiction is lacking."). Accordingly, Plaintiff's claims pursuant to the Georgia Whistleblower Act against all Defendants are **DISMISSED WITHOUT PREJUDICE**. Plaintiff may refile these claims in state court.

## CONCLUSION

Based on the foregoing, the City's motion for summary judgment (Doc. 82) and SAC Defendants' motion for summary judgment (Doc. 86) are **GRANTED**. Additionally, Plaintiff's state law claims brought under the Georgia Whistleblower Act are **DISMISSED WITHOUT PREJUDICE**. The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this _30th_ day of March 2021.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

67